**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

BRENDA FAYE MATTHEWS, )
)
      Plaintiff, )      Case No. 1:14-cv-00160
)      Senior Judge Haynes
v. )
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
)
      Defendant. )

**M E M O R A N D U M**

Plaintiff, Brenda Faye Matthews, filed this action under 42 U.S.C. § 405(g) against the

Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the

Commissioner's denial of her application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the record (Docket Entry No. 16)

contending, in sum, that the Administrative Law Judge ("ALJ") erred in assigning greater weight to

a consulting physician than an examining physician and in finding Plaintiff's statements regarding

her previous workplace and her activities of daily living incredible. The Commissioner contends that

the ALJ's decision is supported by substantial evidence.

Plaintiff's claim was first heard at an evidentiary hearing on April 2, 2012. (Docket Entry

No. 12, Administrative Record, at 51-68).[1] After the hearing, the ALJ determined that Plaintiff was

not under a disability at the relevant time. Id. at 73-89. Plaintiff requested reconsideration, and the

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the
electronic case filing system.

Appeals Council remanded the action. Id. at 152-53, 90-93.

After the second evidentiary hearing, the ALJ evaluated Plaintiff's claim for benefits under the sequential evaluation process set forth at 20 C.F.R. § 404.1520. Id. at 16-17. The ALJ determined that Plaintiff met the insured status requirements through December 31, 2010. Id. at 17. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 1, 2010, the alleged onset date. Id.

At step two, the ALJ determined that Plaintiff has the following severe impairments: lumbar disc disease, diabetes mellitus, and obesity. Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 20-21.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform medium work except that she is limited to frequent overhead reaching. Id. at 21.

At step five, the ALJ found that Plaintiff is able to perform past relevant work as a daycare teacher/aide. Id. at 26. The ALJ concluded that Plaintiff was not disabled within the meaning of the Act and was not entitled to DIB or SSI. Id. After the ALJ's decision, Plaintiff requested a review. Id. at 9-11. On October 20, 2014, the Appeals Council denied Plaintiff's request for review. Id. at 1-5. Accordingly, the second decision from the ALJ dated September 12, 2013, stands as the Commissioner's final decision.

## A. Review of the Record

On February 8, 2011, Plaintiff applied for DIB and SSI benefits, alleging an onset date of disability of May 25, 2001. (Docket Entry No. 12, Administrative Record, at 209). Plaintiff's

alleged onset date was later amended to December 1, 2010. (Docket Entry No. 12 at 232). Plaintiff's medical records predate her alleged onset date of disability.

On November 5, 2009, Plaintiff visited Maury County Health Department and reported that she had Type II diabetes and provided a list of nine medications she was currently taking. Id. at 418-19. Plaintiff was given diabetes supplies and her medications were dispensed. Id. at 419.

On January 15, 2010, Plaintiff visited Maury County Health Department and reported that her "[blood sugar] [was] averaging good – 97 fasting." Id. at 412-13. Plaintiff was noted to be "obese" and "pleasant." Id. at 412. Plaintiff reported "chronic insomnia [for] months. Average 2-3 [hours] sleep" and "depression" that was "stable." Id. at 412-13. Plaintiff was prescribed Trazadone for insomnia, given diabetes supplies, and her medications were dispensed. Id. at 413.

On April 14, 2010, Plaintiff visited Maury County Health Department for medication refills. Id. at 410-11. Plaintiff was given diabetes supplies and her medications were dispensed. Id. at 411.

On July 14, 2010, Plaintiff visited Maury County Health Department for a followup of her diabetes and for medication refills. Id. at 406-07. Plaintiff stated that she wanted "to get off insulin – 'gaining too much [weight].'" Id. at 406. Plaintiff was noted to be "obese." Id. Plaintiff was given diabetes supplies and her medications were dispensed. Id. at 407.

On July 28, 2010, Plaintiff visited Maury County Health Department for a followup. Id. at 403-04. Plaintiff reported "great" blood pressure readings in the morning. Id. at 403. Plaintiff's medications were dispensed and she was encouraged to "continue weight loss." Id. at 404.

On August 18, 2010, Plaintiff visited Maury County Health Department for a PAP smear and a breast exam. Id. at 401-02. Plaintiff stated that she "gets exercise – works daycare," and was noted to be obese. Id. at 401. Plaintiff's medications were dispensed and she was instructed to "[decrease]

3

fats, [decrease] sugars, [increase] walking." Id. at 402.

On October 14, 2010, Plaintiff visited Maury County Health Department for a followup. Id. at 396-97. Plaintiff was given diabetes supplies and blood was taken. Id. at 397.

On January 18, 2011, Plaintiff visited Maury County Health Department for "medication refills." Id. at 390-91. Plaintiff's blood work showed she was "doing well." Id. at 390. Plaintiff's medications were dispensed. Id. at 391.

On February 8, 2011, Plaintiff applied for SSI benefits, alleging an onset date of disability of May 25, 2001. Id. at 209. Plaintiff's alleged onset date was later amended to December 1, 2010. Id. at 232.

On February 8, 2011, N.J. Shuping, a Social Security reviewer, interviewed Plaintiff to complete a work activity report. Id. at 245-55. Plaintiff stated that she worked at Kid's Zone from January 2002 until December 30, 2010 and left because "the daycare where I worked allowed me to sit down when I needed to and allowed me not to lift or carry. I had to do no mopping or cleaning. This daycare closed and there is no other daycare that would allow me to work under these circumstances." Id at 246. Shuping attempted to investigate, but wrote the "day care is closed and I have contacted the previous owner twice by phone (address is unknown) and she does not return my calls. Wages are being averaged as there is no proof of wages however [Plaintiff] states she has worked for this day care (two different owners) for several years continuously." Id. at 252.

On February 28, 2011, Plaintiff completed a disability report. Id. at 260-67. Plaintiff wrote that she had "[d]iabetes, [high blood pressure], bulging disc; pinched nerve; back/hip/leg pain." Id. at 261. Plaintiff stated that she stopped working on December 30, 2010 because "the daycare closed," although she "believe[d her] condition(s) became severe enough to keep [her] from

4

working" on May 25, 2011. Id. Plaintiff described this job as "watched over the kids in the daycare," that included walking, standing, sitting, and writing, typing or handling small objects, but no lifting and carrying. Id. at 263. Plaintiff reported her current medications as Flexeril, Hydrochlorothiazide, Lisinopril, Loratadine, Lovastatin, Metformin, Metoprolol, Naproxen, Novolin, Paxil, Trazadone, Ventolin and Verapamil. Id. at 264.

On March 7, 2011, Plaintiff completed a pain questionnaire. Id. at 268-71. Plaintiff wrote that she experienced pain in her "back[,] hips[,] legs[,] knees" and that she felt this pain every day. Id. at 268. Plaintiff wrote that it was caused by "walking-standing for a long time." Id. Plaintiff wrote that she was taking two pain medications, Flexeril and Naproxen, but that they did not relieve the pain "because I cannot get good pain meds I have no insurance - the Health Dept can not give pain med." Id. Plaintiff stated that she used "heating pad[,] ice pack[,] pillow under my back[,] pillow between my legs" to relieve the pain. Id. at 269. Plaintiff described her limitations as "cou[l]dn't sleep – just very limited[,] no yard work, couldn't sweep – mop or run the vac[uum] – sometimes hurt[s] to lay down or sit up for a long period of time[,] hurts to walk up and down steps, getting in and out of can[,] no socializing, the most walking is inside my home – maybe one household chore a day[,] driving only necessary[.]" Id.

On March 11, 2011, Plaintiff completed a function report. Id. at 272-81. Plaintiff wrote that "my back hurts all the time[.] My legs also hurt[] and also my knees. Sometimes it is hard for me to stand for a long period of time. It affected my work because I worked for a preschool and I couldn[']t pick up the children or do a lot of lifting or standing. I also couldn[']t get down [on] my knees." Id. at 272. Plaintiff wrote that she was limited by "has problems tying my shoes and put[t]ing my socks on," "has a walk in shower or washes in sink," "has help washing my hair," "my

knees hurt getting on or off the toilet," and "[i]t is very hard for me to sleep with[]out medication." Id. at 273. Plaintiff wrote that she could not do yard work because "my back and legs hurt too bad," but could do laundry that took "2 hrs once a week" and cleaning that took "20 min once a week;" Plaintiff could also shop for "groceries or househol[d] products" "once a week" for "1 hr." Id. at 274-75. Plaintiff reported that she enjoyed "reading and watching TV" and that she had "dinner on Sundays ... with my children" and "talk[ed] on [the] phone every day ... to my mother and friends." Id. at 276. Plaintiff wrote that she was limited in lifting, squatting, bending, standing, reaching, walking, kneeling, and stair climbing, specifically "lifting – 10 pounds – no squatting at all – can bend only so far – can[']t stand for long at all – can reach but hurts, no [k]neeling at all[,] takes longer to climb stairs – walk about 15 min." Id. at 277. Plaintiff wrote that she could walk for "about 15 min" before needing to stop and rest for "15 min." Id. Plaintiff noted, "I also have [diabetes], high blood p[re]ssure, uses a [illegible] for breathing." Id. at 279.

On April 12, 2011, Dr. Deborah J. Morton of Tennessee Disability Determination Services conducted an examination of Plaintiff. Id. at 328-31. Regarding her medical history, Dr. Morton wrote:

> 1. Back pain since 1999. She states that she had no injury. The pain began in her lumbar region and radiates down her right leg. She has had an MRI in 2001, which showed a bulging disk. She was offered either injections or surgery at that time. She chose to try the injections. She states the injections did help, but she ran out of insurance and has not had any injections since then. She states she continued to work as a daycare worker and that required lifting the children sometimes and this has exacerbated her back problems and she can no longer do that job. She has had no further testing. She has had no further injection. She does not go to a pain clinic and she has not been reevaluated with an MRI to see if she continues to need the surgery.
> 2. Right hip and leg pain since 1999. She states this starts in her back and radiates down her leg. She has swelling and stiffness sometimes in that leg as well as pain.
> 3. Shortness of breath. She states that she has had bronchitis for several years and has been put on a Ventolin inhaler. She states that she does get short of breath while

walking.

Id. at 328.

Dr. Morton described Plaintiff as "morbidly obese," and 259 pounds at a height of 61 inches. Id. at 329. Upon examination, Plaintiff could "get out of a chair unassisted." Id. at 330. Plaintiff's range of motion examination was largely normal, although when rocking back on her heels she was "slightly off balance," and the "[s]traight leg raise caused pain in her hips bilaterally at 30 degrees, but did not cause significant back pain." Id.

Dr. Morton also completed a medical source statement. Id. at 332-38. Dr. Morton opined that Plaintiff could lift and carry eleven to twenty pounds frequently due to "[b]ack pain – bulging lumbar disc," but did not complete the remainder of this section. Id. at 332. Dr. Morton opined that Plaintiff could sit for two hours at a time, for a total of six hours in an eight hour workday; stand for fifteen minutes at a time, for a total of one hour in an eight hour workday; and walk for twenty minutes at a time, for a total of two hours in an eight hour workday. Id. at 333. These restrictions were based on Plaintiff's "back pain [to] lumbar disc[,] must change positions a lot[.]" Id. Dr. Morton also restricted Plaintiff to frequently reaching overhead, balancing and stooping; to occasionally climbing stairs and ramps, kneeling, crouching and crawling; and to never climbing ladders or scaffolds due to "[l]umbar disc bulging – knees hurting she tries to kneel or getting down she cannot get up again without help[.]" Id. at 333-34. Dr. Morton limited Plaintiff to frequent exposure to unprotected heights, to dust, odors, fumes and pulmonary irritants that "makes [shortness of breath] [and] bronchitis worse" and to vibrations. Id. at 335-36.

On April 20, 2011, Dr. Karla Montague-Brown conducted a physical RFC. Id. at 339-47. Dr. Montague-Brown considered Plaintiff's primary diagnosis as obesity, secondary diagnosis as

diabetes mellitus, and other alleged impairments as "[b]reathing, nerve, back, hip/leg problems[.]"
Id. at 339. Dr. Montague-Brown limited Plaintiff to occasionally lifting and carrying fifty pounds and frequently lifting and carrying twenty-five pounds. Id. at 340. Plaintiff could stand, walk and sit for about six hours in an eight hour workday. Id. Plaintiff was limited to frequently climbing ramps and stairs, balancing, stopping, kneeling, crouching and crawling, and to occasionally climbing ladders, ropes and scaffolds. Id. at 341. Plaintiff's ability to reach in all directions, including overhead, was limited "due to slight decrease in shoulders [range of motion] bilaterally." Id. at 342. Plaintiff's far acuity vision was also limited "to activities not requiring fine visual discriminatory skills due to VA with glasses 20/50 [right eye], [left eye] and [both eyes]." Id. Dr. Montague-Brown wrote:

> [Plaintiff] has [medically determinable impairment] that could reasonably cause pain symptoms, see pg 8 for detailed discussion.
>
> [Plaintiff] allegation of functional limitations is partially credible as [Plaintiff] has [medically determinable impairments] that could cause pain symptoms but not to the degree [Plaintiff] reports.

Id. at 344.

Dr. Montague-Brown also wrote that although there was a medical source statement that was significantly different from her findings, the "[medical assessment] [is] not given controlling weight to panelist Dr Morton due to lack of treating relationship with [Plaintiff]. [Medical assessment] [is] given less weight based on normal [range of motion] of all joints except slight decrease in shoulders forward elevation to 120 and L-spine extension to 15." Id. at 345. Dr. Montague-Brown found that Plaintiff did not have a medically determinable impairment of back pain, nerve pinch, hip pain, leg pain or breathing problems, but did have the medically determinable impairments of diabetes

mellitus, high blood pressure and morbid obesity. Id. at 346. Dr. Montague-Brown also noted that "[f]rom [alleged date of disability] or POD to end of [date last insured] 12/31/10 is technically insufficient for not enough [medical evidence of record] to assess severity of impairments." Id. at 347.

On April 26, 2011, Deborah Doineau, Ed.D. conducted a psychological evaluation for Tennessee Disability Determination Services. Id. at 348-52. Plaintiff did not bring medical records, and Dr. Doineau had none to review. Id. at 347. Plaintiff reported although "she has never received any formal mental health treatment," she began taking Paxil, an anti-depressant, in the 1990s, and was still taking it, and she also took Trazodone, another anti-depressant, "to help her sleep at night." Id. at 349. Upon speaking with Plaintiff, Dr. Doineau determined that Plaintiff's "IQ was thought to be in the low average range." Id. at 350. Plaintiff attributed her depression to "not being able to work and thinking about this" and "[t]he diagnosis of diabetes ... because she doesn't want to have to deal with it." Id. Plaintiff reported that she had trouble doing dishes "if she has a lot of dishes, she has to stop and rest because of her back and leg problems," and trouble keeping the house as clean as she preferred. Id. at 351. Plaintiff also listed several tasks she was capable of performing: "wash her own clothing," "watches television," "talks on the phone," "prepares [lunch] herself," "go shopping and engage in more activities if she had more fun and didn't have back and leg problems," "drive to the drugstore, to doctor's appointments, or to the grocery store," see her son and grandson from "around 4 o'clock p.m. and they stay until 6 or 6:30," "prepares dinner," "reads her mail," "keeps up with appointments," "drives to appointments," "makes her own decisions," "looks after her personal needs," "pays bills with her unemployment compensation using money orders," has "social contact with people daily," and "does her own grocery shopping but doesn't shop for fun

9

because it is difficult for her to walk around." Id. Dr. Doineau concluded, Plaintiff "stated that she has had issues with depression off and on, that is fairly well managed with medication. She has a steady work history until she lost her last job when the facility shut down. She has ongoing back and other medical problems that limit her activities." Id. at 352.

Dr. Doineau also completed a medical source statement for Plaintiff. Id. at 354-57. Dr. Doineau opined that Plaintiff's ability to "understand, remember, and carry out instructions" was affected, specifically, a mild restriction in her ability to "[c]arry out complex instructions." Id. at 354. This is the only restriction Dr. Doineau listed. Id. at 354-57.

On May 3, 2011, Nevein Ayoub, with the Tennessee Department of Rehabilitation Services, completed a vocational analysis worksheet. Id. at 282-85. Ayoub opined that Plaintiff was capable of lifting fifty pounds maximum and twenty-five pounds frequently and could stand, sit, and walk for six hours in an eight hour workday. Id. at 282. Ayoub determined that Plaintiff could only occasionally climb ladders, ropes, and scaffolds, but could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. Id. Ayoub limited Plaintiff in her ability to reach in all directions, including overhead and her visual far acuity, but found Plaintiff unlimited in all other areas of review. Id.

On May 3, 2011, Dr. Larry Welch conducted a "psychiatric review technique" for Plaintiff. Id. at 358-71. Dr. Welch evaluated Plaintiff for a "Affective Disorder[]," specifically "Depressive [Disorder] [not otherwise specified]." Id. at 358, 361. Dr. Welch assigned Plaintiff a mild limitation in "difficulties in maintaining social functioning" and "difficulties in maintaining concentration, persistence, or pace." Id. at 368. Dr. Welch concluded:

[Plaintiff] has the medically determinable impairment of Depressive [Disorder] [not

otherwise specified]. This [medically determinable impairment] can reasonably be expected to produce the above stated symptoms. [Plaintiff's] statements are credible and [Plaintiff] reports no significant limitations. Psych [consultative examination] reports mild limitations. The [consultative examination] Panelist is the only acceptable [medical history] source in file and the provided [medical source opinion] is not inconsistent with other evidence and is therefore given great weight. [Plaintiff's] [symptoms] and impairments would not singly or in combination prevent [Plaintiff] from completing or sustaining work-like activities; [Plaintiff's] condition is non-severe. [Plaintiff] is capable of managing funds.

FOR DIB CLAIM – Evidence is insufficient to determine level of severity for time period 05/25/01 to 12/31/10.

Id. at 370.

On June 3, 2011, Mason Currey, Ph.D., conducted a case analysis on reconsideration of Plaintiff's mental disorder allegations. Id. at 372. Plaintiff had made "[n]o new allegations, worsening or [treatment]," so Dr. Currey concluded that "I have reviewed all the evidence in file and the assessment of 5/3/11, which is considered technically and substantively correct and which correctly presented and resolved all pertinent issues to be adjudicated, is affirmed as written." Id.

On June 7, 2011, Dr,. Thomas E. Thursh conducted a case analysis on reconsideration of Plaintiff's physical disorder allegations. Id. at 373. Plaintiff had made "no new allegations [of] worsening," so Dr. Thursh concluded that because there was "[n]othing of significance that would warrant a change of the initial assessment ... the assessment dated 04/20/11 is affirmed, as written." Id.

On June 14, 2011, Plaintiff visited the Maury County Health Department complaining of "fatigue," "hair loss," "no motivation, cries easily. No energy," "out of work." Id. at 388-89. Plaintiff stated that she was depressed and had run out of Paxil, an anti-depressant, two weeks before; Plaintiff also complained that her Trazodone, another anti-depressant, was "causing

11

nightmares." Id. at 388. Plaintiff had physical complaints as well, of "[oasteoarthritis] pain knee and hands/joints." Id. Plaintiff was given new diabetes supplies and her medications were dispensed. Id. at 389.

On June 15, 2011, Plaintiff completed a disability report for her appeal. Id. at 293-300. Plaintiff wrote that there was not any change in her condition since her last disability report. Id. at 293. Plaintiff listed the following as current medications: Paxil for "depression," Trazodone for "sleep," Loratadine for "allergy," Verapamil, Lisinopril and Metoprolo for "high blood pressure," Lovastatin for "cholesterol," Metformin for "diabetes," Novolin for "insulin," Ventolin for "breathing," Hydrochlorothiazide for "fluid," Naproxen for "muscle relaxer" and Flexeril for "muscle relaxer." Id. at 296, 299.

On July 5, 2011, Plaintiff visited the Maury County Health Department for a followup. Id. at 383-84. Plaintiff had "lost 3 lbs" and her "depression [was] stable, not crying but still no motivation." Id. at 383. Plaintiff's medications were dispensed. Id. at 384.

On September 23, 2011, Plaintiff visited the Maury County Health Department for an annual physical. Id. at 381-82. Plaintiff was noted to be "obese" but had "[lost] 20 lbs since last year." Id. at 381. Plaintiff was instructed to "[decrease] fats, [decrease] sugars, [increase] walking." Id. at 382.

On October 19, 2011, Plaintiff visited the Maury County Health Department, complaining of "[a]rthritis pain in back [and] legs. Denies any injuries." Id. at 378-79. It was noted that Plaintiff was "obese." Id. at 378. Plaintiff was given a new glucometer and needles and her medications were dispensed. Id. at 379. Plaintiff was instructed to "[c]ontinue to work on weight loss exercise 30 min to one hour five days week. Back exercise reviewed [and] handout given." Id. Plaintiff had blood

taken, and her blood work was "normal." Id. at 376-77.

On November 1, 2011, Plaintiff made an appointment for an initial assessment at Centerstone. Id. at 456. Plaintiff stated that she "will apply for safety net. [Plaintiff] is coming in for counseling and med[ication] [management]. [Plaintiff] has concerns of depression and anxiety." Id.

On November 7, 2011, Plaintiff visited Centerstone for an initial assessment. Id. at 451-59. Plaintiff's "affective and behavioral presentation during the intake [wa]s consistent with the diagnosis of: Depressive [disorder] [not otherwise specified]; Anxiety [disorder] [not otherwise specified]." Id. at 451. Plaintiff identified her "[r]elevant medical history" as "[d]iabetes, high blood pressure, chronic pain in legs and back." Id. at 455. Plaintiff "report[ed] some depression. Feels like something is on her mind all the time. Laid off of work since Dec 2010. Was having physical health issues that limited her abilities at work and she was laid off. States she now just sits at home doing nothing. Reports she does not socialize. No desire to get out. Worrying about things all the time. Reports trouble sleeping due to 'mind rambling.' Denies [suicidal ideation] however states sometimes she just wants to crawl in a hole and not be bothered." Id. at 456. Plaintiff identified as her primary goal that "I would like to be happier and not worry about stuff so much. " Id. at 458. Upon completing the "Needs Assessment," Plaintiff "identified apply for disability as her only need for which she reports she already has assistance from an attorney and requires no further assistance. Therapist discussed case management services with the client and they declined to participate." Id.

On December 5, 2011, Plaintiff visited Rosemary Scott at Centerstone "with complaints of needing help with de[pr]ession." Id. at 445-50. Plaintiff complained of "being laid off last year," "not wanting to do much," "sad all the time, has no motivation to do much, worries all the time,"

13

"has been depressed for some time." Id. at 445. Plaintiff reported that she had been taking Paxil, an anti-depressant, "with no help;" Celexa, an anti-depressant, but Plaintiff "can[']t remember if [it] helped or not;" and was currently taking Prozac, an anti-depressant, "for the last three months has not ever helped." Id. Plaintiff was also currently taking Vistaril, an anti-anxiety medication, that was "helping good with her sleep." Id. Plaintiff stated that she was "here today to get help with sad moods[,] lack of motivation[,] no energy and wanting to stay in the house all the time, c[ry]ing spells and constant worry." Id. Plaintiff also reported "chronic back and leg pain." Id. at 446. Scott "cont[inued] vistaril from health dep[artment] for ni[ght] time anxiety and sleep. [It is] working well and [Plaintiff] gets this med[ication] at the health dep[artment] clinic so they will cont[inue] this." Id. at 448. Scott also discontinued Plaintiff's Prozac and prescribed Zoloft instead. Id.

On December 13, 2011, Plaintiff visited Susan O'Malley at Centerstone for counseling. Id. at 442-44. Plaintiff identified several goals and objectives: "[a]lleviate depressed mood and return to previous level of effective functioning," "[c]ontinue to explore sources of depression by identifying 1-3 things that are missing from life to cause unhappiness," "[d]evelop an understanding of negative cognitive self-talk and automatic thoughts as evidenced by participation in therapy sessions," "[i]dentify 1-3 incidences from past or present life experiences that contribute to sadness," and "[v]erbally identify and process 3 stressors that increase depressed mood and develop 3 coping skills to reduce the stressors and improve mood." Id. at 442. This was Plaintiff's "[f]irst therapy session" and she reported that she "[h]as been having difficulty getting to sleep, has dreams she is with people she was close [to] that have passed away." Id. Plaintiff also "[r]eports having problems motivating herself to do thing[s], procrastinates a[ ]lot," but "[d]enies any major depression." Id. Plaintiff displayed a "fair affect" and O'Malley noted "no major symptoms of depression." Id.

On January 4, 2012, Plaintiff visited Scott at Centerstone and "rep[or]ts doing better.[ S]till having some down sad days but says she is not as sad as she was and feels the med[ication] is working.[ S]ays she is not having crying spells like she was and she is sleeping better.[ S]ays not having night[]mares like she was." Id. at 440-41. Plaintiff wanted to continue her prescription for Zoloft and "re[or]ts feels less anxious[.]" Id. at 440. Plaintiff's Zoloft prescription was increased to 100 mg. Id. at 441.

On January 10, 2012, Plaintiff visited the Maury County Health Department for a "check up [and] meds refilled." Id. at 374-75. Plaintiff was "doing well on current meds" and her medications were dispensed. Id.

On January 11, 2012, Plaintiff visited O'Malley at Centerstone and reported "slight improvement" in alleviating her depression and finding its source, and "some improvement" in other goals. Id. at 437-39. Plaintiff "[r]eports decrease in nightmares, still having dreams but they are just 'crazy' not violent. Reports she enjoyed Ch[r]istmas with her family." Id. at 437. Plaintiff displayed a "fair affect," but was "still having difficulty motivating herself due to low energy level." Id.

On February 10, 2012, Plaintiff visited O'Malley at Centerstone and reported showing "slight improvement" in her goals. Id. at 433-36. Plaintiff reported a "decrease in crying and crazy dreams," but "[s]till ha[s] nights w[h]ere she doesn't sleep well." Id. at 434. Plaintiff also "has no energy, could stay in bed all day but makes herself get up[.]" Id. Plaintiff displayed a "fair affect" and was "smiling part of the time." Id.

On February 29, 2012, Plaintiff visited Scott at Centerstone. Id. at 431-32. Plaintiff "reports doing better.[ S]ays the [increase] in zoloft has really helped her moods and calmed her.[ Denies]

any depressive issues." Id. at 431. Plaintiff did complain of "not sleeping well," and attributed it to Vistaril, a sedative anti-anxiety medication she was prescribed by Maury County Health Department. Id. Plaintiff reported that she had done well with Ambien in the past, and requested to be prescribed it again. Id. Plaintiff was prescribed Ambien and told to discontinue Vistaril. Id. at 432.

On March 14, 2012, Plaintiff visited O'Malley at Centerstone and reported showing "slight improvement" in her goals. Id. at 427-30. Plaintiff reported that she was "sleeping better, not having nightmares. Reports she continues to feel less depressed but still having difficulty motivating herself." Id. at 428. Plaintiff showed a "fair affect" and was "smiling more." Id.

On March 14, 2012, O'Malley also completed an "assessment of mental limitations" form for Plaintiff. Id. at 422-25. On a scale of "unlimited" to "none," O'Malley opined that Plaintiff had "poor" ability to perform the following tasks: "[a]bility to perform activities of daily living independently and appropriately, free of supervision or direction," "[c]apacity to interact appropriately, communicate effectively, and engage in other aspects of social functioning," "[a]bilities of Concentration Persistence and Pace," "[a]bility of patient to adapt to stressful circumstances in work or work-like settings where failure to adapt results [in] repeated episodes of deterioration or decompensation which cause patient to withdraw or to experience an exacerbation of symptoms," the ability to "[f]ollow work rules," "[d]eal with the public," "[d]eal with stress of ordinary work," "[d]emonstrate reliability," "[p]ersist at assigned tasks," "[a]bility to relate to supervisors and co-workers," "[w]ork at a consistent pace for acceptable periods of time," and "[a]bility to timely complete tasks commonly found in work settings." Id. at 422-24. "Poor" ability is defined as "[a]bility in this area is usually precluded." Id. at 422. O'Malley anticipated that

16

Plaintiff would have a "fair" ability in only one area: "[m]aintain personal appearance." Id. at 423. As reasoning, O'Malley wrote that "client has great difficulty being bale to complete simple tasks at home. Great difficulty being on her feet for any length or time. Doesn't like being around a group of people, causes increase in anxiety, irritability." Id. at 424. Although the signature line contains the note that "this form must be signed by an M.D. or licensed psychologist," Susan O'Malley, LPC-MHSP is the only signature. Id.

On April 10, 2012, Plaintiff visited Maury County Health Department and reported that she was "[d]oing well on meds[.]" Id. at 496-97. Plaintiff was given diabetes supplies, her medications were dispensed, and she was "[e]nrolled in YMCA Prevention Program[.]" Id. at 497.

On May 30, 2012, the ALJ issued his decision, and stated that Plaintiff was not disabled under the terms of the Social Security Act for either DIB or SSI. Id. at 73-89. The ALJ determined that Plaintiff had the following severe impairments: lumbar disc disease, diabetes mellitus, and obesity, but that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Id. at 78, 81. The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work, except that she was limited to only frequent overhead reaching. Id. at 81. The ALJ found that Plaintiff was capable of performing her past relevant work as a nursery worker, and as such was not disabled. Id. at 85.

On June 8, 2012, Plaintiff requested reconsideration of the ALJ's decision. Id. at 152-53. Plaintiff wrote that "I am still disabled and unable to work." Id. at 152. Plaintiff filed a brief, alleging that the ALJ erred by "disregarding the procedures outlined in Social Security Ruling 02P-01 regarding the assessment of obesity" and by "giving inappropriate deference to the consultative examiner over the treating physician. Specifically, ALJ Horton (sic) erred by rejecting the opinion

of the examining physician, Consultative Examiner, Dr. Deborah Morton." Id. at 306-09.

On July 10, 2012, Plaintiff visited Maury County Health Department and was noted to be "obese" and "pleasant." Id. at 492-93. Plaintiff was given diabetes supplies and her medications were dispensed. Id. at 493.

On October 10, 2012, Plaintiff visited Maury County Health Department with a "dry cough on Lisinopril," a blood pressure medication, and "lower back/hip pain [that] radiates down leg. Mobic [an anti-inflammatory] wasn't helpful." Id. at 489-90. Plaintiff was noted to have "some scattered wheezing throughout but no respiratory distress" and also "[g]eneral [lower back pain], can ambulate." Id. at 489. Plaintiff was given diabetes supplies and her medications were dispensed. Id. at 490.

On November 2, 2012, Plaintiff visited Maury County Health Department with a "touch of asthma[,] wheezing worse." Id. at 487-88. Plaintiff stated that she "frequently has bronchitis[,] [past medical history of] asthma[.]" Id. at 487. Plaintiff was noted to be "pleasant" and to have a "diminished air exchange[.]" Id. Plaintiff was given a nebulizer, and her medications were dispensed. Id. at 488.

On November 20, 2012, Plaintiff visited Maury County Health Department "still having [a] lot of chest congestion[,] wheezing worse ...[,] cough medication helped very little[,] [shortness of breath] with activity[,] lot of asthma flare ups recently[.]" Id. at 485-86. Plaintiff was noted to have a "diminished air exchange." Id. at 485. Plaintiff's medications were dispensed, and she was advised to "avoid asthma triggers." Id. at 486.

On January 11, 2013, Plaintiff visited Maury County Health Department with "asthma flare ups." Id. at 481-82. Plaintiff was noted to be "obese" and to have "faint wheezes" in her lungs. Id.

at 481. At this visit, Plaintiff's conditions were listed as asthma, diabetes mellitus Type II, hypertension and hyperlipidemia. Id. at 482. Plaintiff was given diabetes supples and her medications were dispensed. Id.

On January 28, 2013, Plaintiff visited Maury County Health Department for a "[potassium] level" test and "otherwise [had] no new [complaints]." Id. at 478-79.

On April 11, 2013, the Appeals Council remanded Plaintiff's action to the ALJ. Id. at 90-93. The Appeals Council "grant[ed] the request for review under the substantial evidence provision of the Social Security Administration regulations ... for resolution of the following issue: The hearing decision indicates that the claimant's obesity is a severe impairment. The evidentiary evidence establishes that the claimant has a BMI of 48.9 which is classified as severe obesity in Social Security Ruling (SSR) 02-1p. However, the hearing decision does not include an evaluation as to how obesity affects the claimant's functioning. The claimant complains of back, hip and knee pain, which the State agency nonexamining reviewer indicates could [be] attributed to obesity." Id. at 91.

On May 7, 2013, Plaintiff visited Maury County Health Department "[complaining of] chronic [low back pain] = both legs hurting = 'I can't walk.'" Id. at 475-76. It was noted that Plaintiff was "obese." Id. 475. Plaintiff was given diabetes supplies and her medications were dispensed; Plaintiff stated that she "prefers to get Zoloft here, not Centerstone." Id. at 476.

On June 13, 2013, Plaintiff visited Family Health Group "with bilateral feet swelling." Id. at 469-73. Plaintiff stated that the "symptoms began 1 week ago. ... She is diab[e]tic and states this is under control." Id. at 469. Plaintiff also reported "high blood pressure and she takes HCTZ, amlodipine and verapamil for this" and "[b]ack [p]ain[ s]he states this started several years ago (2002) and she was told she had a bulging disk. She had injections in her back which helped at the

19

time but she doesn[']t have any insurance to do this now. She is on naproxen." Id. Plaintiff's complete list of medications was reported as: Amlodipine, Humulin, Hydrochlorothiazide, Hydroxyzine, Lovastatin, Metformin, Metoprolol, Naproxen, Potassium chloride, Sertraline, Ventolin, Verapamil, and Advair. Id. at 471-72. Plaintiff was scheduled for a followup if there was no improvement within ten days. Id. at 471.

On June 21, 2013, Plaintiff visited Family Health Group "with back pain and [for] test results." Id. at 462-64. Plaintiff complained of lower back pain that did not radiate, and that Plaintiff described as "an ache." Id. at 462. Plaintiff's pain was "aggravated by sitting, standing, twisting and walking" and Plaintiff stated that she did not experience any relieving factors. Id. Plaintiff requested an x-ray. Id. Plaintiff also underwent a "[s]odium and potassium" test because it was abnormal at her last visit. Id. Plaintiff's chronic conditions were listed as diabetes, hypertension, and hyperlipidemia. Id. Plaintiff's x-ray showed "[m]oderate degenerative disk disease and grade 1 degenerative anterolisthesis at L4-5 the signs raise potential of significant spinal canal stenosis. Follow-up with lumbar MRI may be helpful. Mild degenerative disk disease at L3-4." Id. at 465.

On July 23, 2013, the remanded hearing was held before the ALJ to determine Plaintiff's eligibility for SSI and DIB. Id. at 34-50.

### B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. §

1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff contends that the ALJ erred by deferring to the opinion of a consultant and rejecting the opinion of Dr. Morton and by failing to utilize SSR 96-7p regarding Plaintiff's subjective complaints.

Plaintiff's first assertion of error is that the ALJ did not credit the opinion of Dr. Deborah J. Morton, a Tennessee Disability Determination Services examiner who conducted an examination of Plaintiff on April 12, 2011. (Docket Entry No. 12 at 328-31). The ALJ wrote:

> Dr. Morton's clinical observations generally support the residual functional capacity above. Dr. Morton recorded the claimant's complaints of back pain, joint pain, breathing difficulties, and obesity, but her symptoms were out of proportion to the clinical observations. Contrary to the claimant's allegations, Dr. Morton observed the claimant alert and in no acute distress. The claimant's lungs were also clear to auscultation without labored breathing. The claimant's hip, knees, and ankles, were normal in motion, strength, and sensation. Dr Morton recorded the claimant's subjective complaints of back pain and diagnosed bulging lumbar disc and right leg pain from a pinched nerve in the claimant's back. However, diagnostic testing supports neither of these diagnoses. Moreover, the diagnoses were based on the claimant's subjective complaints, which are not entirely consistent with the results

of Dr. Morton's physical exam. For instance, Dr. Morton observed the claimant, with normal gait and station and (sic) get out of her chair without difficulty. She also observed the claimant tandem walk, stand on her toes, and experience only a slight loss of balance when she rocked back on her heels. While the claimant had a slight decrease motion (sic) in her lumbar spine, a single leg raise test did not cause significant pain in her back. The claimant was also neurologically intact, despite a slight decrease in her shoulder range of motion. While Dr. Morton's diagnoses are not entirely supported, her clinical observations are considered in the residual functional capacity above.

Id. at 24. Dr. Morton also completed a medical source statement. Regarding the limitations contained in that statement, the ALJ wrote:

> Dr. Morton opined that the claimant could lift and carry up to 20 pounds frequently; sit for 2 hours at one time for a total of 6 hours out of an 8-hour workday; stand for 15 minutes at one times (sic) and for a total of 1 hour out of an 8-hour workday; walk for 20 minutes at one times (sic) and for a total of 2 hours out of an 8-hour workday; frequently reach overhead bilaterally; frequently balance and stoop; occasionally kneel, crouch, and crawl; occasionally climb stairs and ramps, but never ladders or scaffolds; and frequently tolerate exposure to unprotected heights, vibrations, and dust, odors, fumes and pulmonary irritants. The undersigned accords significant weight to Dr. Morton's opinion regarding the limitation to frequent use of bilateral upper extremities in overhead reaching. This portion of her opinion is consistent with the residual functional capacity above and is supported by the claimant's decreased range of motion in her shoulders. However, the remainder of Dr. Morton's opinion is given little weight. While the record includes evidence of obesity, lumbar disc disease, and diabetes, it does not justify a finding of greater restriction than what is afforded in the residual functional capacity above. The claimant's daily activities reveal greater functioning than what Dr. Morton opined. For instance, the claimant prepares meals, shops for groceries, does laundry, washes dishes, drives, spends time with friends and family, and even watches her grandson during overnight stays. Further, the claimant's pulmonary impairment is non-severe and does not require restriction. Dr. Morton's opinion is given partial weight with the appropriate delineations assigned above.

Id. at 25-26.

Dr. Morton examined Plaintiff for this report, but was not a treating physician. "Generally, a treating physician's opinion deserves controlling weight because 'a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the

medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." Coldiron v. Comm'r of Soc. Sec., 391 F.App'x 435, 442 (6th Cir. 2010) (quoting Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994)). Yet when, as here, the state examiner only examined the Plaintiff once, that doctor "do[es] not, for purposes of the regulation, constitute [a] treating physician[]. Thus, the treating physician rule did not oblige the ALJ to grant the opinions of [a state examiner] controlling weight." Id. (citations omitted). When considering the opinion of an examining physician, "[a]n ALJ should generally give greater weight to the opinion of an examining physician than to a non-examining physician's opinion. However, an ALJ may reject a consulting physician's opinion based on substantial evidence in the record." Whitfield v. Astrue, No. 3:07-cv-1091, 2009 WL 1684489 at *2 (M.D. Tenn. June 15, 2009).

In addition to her examination, Dr. Morton also considered some of Plaintiff's medical records. Yet Dr. Morton apparently did not have access to any records of Plaintiff's back, knee, or hip pain. The records reviewed by Dr. Morton included notes about bronchitis; lab work of Plaintiff's hemoglobin A1c that "was high at 7.6," suggesting diabetes; and lab work showing cholesterol and sugar levels. (Docket Entry No. 12 at 330). Despite the lack of relevant medical records, Dr. Morton listed in her diagnoses both "[b]ulging lumbar disk" and "[r]ight leg pain from a pinched nerve due to her back problems." Id. at 330. These diagnoses were provided by Plaintiff, who stated that "[s]he has had an MRI in 2001, which showed a bulging disk." Id. at 328.

In contrast to Dr. Morton's diagnoses, upon examination Dr. Morton stated that Plaintiff was "in no acute distress," her "[d]eep tendon reflexes were 2+ [normal] at the upper extremities and 1+ [trace] in the lower extremities in the knees and ankles bilaterally," and had a largely normal range of motion examination. Id. at 329-30. Specifically, Dr. Morton wrote that:

23

The claimant was able to get out of a chair unassisted. She did not use an assistive device. Her gait and station were normal. She could tandem walk for six steps. She could stand on her toes. She could rock back on her heels, but was slightly off balance while doing this. Straight leg raise caused pain in her hips bilaterally at 30 degrees, but did not cause significant back pain. Her Romberg was normal. Strength and sensation at the upper and lower extremities was normal. Range of motion, the cervical spine was normal. The dorsolumbar spine showed flexion to 90 degrees, extension to 15 degrees, right and left lateral flexion to 25 degrees. The shoulders had normal abduction, internal and external rotation bilaterally, but had forward elevation to only 130 degrees bilaterally. Elbows and wrists were normal. Hip, knee, and ankle were normal.

Id. at 330.

The ALJ wrote that "the diagnoses were based on the claimant's subjective complaints, which are not entirely consistent with the results of Dr. Morton's physical exam." Id. at 24. As reflected above, Dr. Morton did not observe any physical condition of Plaintiff, but did diagnose Plaintiff with a "bulging disk" and a "pinched nerve" and restricted Plaintiff's ability to sit, stand, walk, and lift. Yet the ALJ neglected to consider the x-ray taken on June 21, 2013. The ALJ wrote of the x-ray, "[w]hile a June 2013 x-ray of [Plaintiff's] lumbar spine reveals moderate degenerative disc disease at L4-5 and mild degenerative disc disease at L3-4, it did not indicate evidence of bulging discs." Id. at 22. The ALJ failed to consider this diagnosis of degenerative disc disease as objective evidence that could support Dr. Morton's opinion. The Court concludes that this was an error.

Plaintiff contrasts the weight given Dr. Morton's opinion to the weight given to the opinion of Dr. Karla Montague-Brown, a medical consultant who conducted a physical RFC on April 20, 2011. Id. at 339-47. Dr. Montague-Brown was not an examining physician; she only reviewed Plaintiff's medical records. Regarding Dr. Montague-Brown's opinion, the ALJ wrote:

State agency medical consultant, Karla Montague-Brown, MD, opined that the

24

claimant could engage in a reduced range of medium exertional work. Dr. Montague-Brown opined the claimant's was (sic) limited to the following: frequent climbing of ramps and stairs, but occasional climbing of ladders, ropes, and scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; and frequent overhead reaching bilaterally. The undersigned accords significant weight to Dr. Montague-Brown's opinion regarding the level of exertional work as well as the limitation to frequent use of bilateral upper extremities in overhead reaching. This portion of her opinion is consistent with the residual functional capacity above and is supported by the claimant's decreased range of motion in her shoulders. However, Dr. Montague-Brown's limitation on postural activity is accorded little weight. While the record includes evidence of obesity, diabetes, and lumbar disc disease, it does not justify a finding of greater restriction than what(sic) included in the residual functional capacity above. The claimant's reports of activities of daily living conflict with the postural restrictions given by Dr. Montague-Brown. Dr. Montague-Brown's opinion is given partial weight with the appropriate delineation assigned above.

Id. at 25.

The ALJ gave "significant weight" specifically to Dr. Montague-Brown's "opinion regarding the level of exertional work as well as the limitation to frequent use of bilateral upper extremities in overhead reaching." Dr. Montague-Brown's opinion regarding Plaintiff's exertional ability was that Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and could sit, stand and walk for six hours in an eight-hour workday. Id. at 340. These are the requirements of medium work, defined as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday[.]" Social Security Regulation 83-10. Dr. Montague-Brown considered Dr. Morton's opinion as part of Plaintiff's medical record, but did not give it controlling weight "due to lack of treating relationship with [Plaintiff]." (Docket Entry No. 12 at 345). Dr. Montague-Brown also noted that although Plaintiff alleged back, hip and leg pain, none of these conditions were "shown by any imaging." Id. at 346. Dr. Montague-Brown

also noted that these allegations of pain "could be due to obesity BMI 48.9." Id. In reviewing this opinion, the ALJ stated only that the exertional limitations were "supported by the claimant's deceased range of motion in her shoulders," but that the postural limitations conflicted with Plaintiff's "reports of activities of daily living." Id. at 25. Plaintiff contests the significant weight given to Dr. Montague-Brown's exertional limitations.

Plaintiff regularly visited Maury County Health Department. Although she did not visit the same doctor each time, the ALJ noted that Plaintiff had "established relationships with physicians at Maury County Health Department[.]" Id. at 22. The ALJ wrote that Plaintiff rarely complained of back pain, and that when she did, she was still noted to be "in no apparent distress" and her exams were "essentially normal." Id. Further, the ALJ wrote that providers at Maury County Health Department "noted the claimant ambulates without difficulty," "had normal gait and station, was able to walk on heels and toes, and could tandem walk and balance on each leg," and that "x-rays confirmed no greater than mild-to-moderate lumbar degenerative disc disease." Id. at 23. Yet, Dr. Montague-Brown was not able to consider the x-ray herself, as it was conducted after Dr. Montague-Brown's review.

The medical record reflects that Plaintiff did not complain of physical pain often. During her visits at Maury County Health Department, Plaintiff complained of back pain four times. On June 14, 2011, Plaintiff stated that osteoarthritis was causing her knee, hand, and joint pain. Id. at 388-89. On October 19, 2011, Plaintiff stated that arthritis was causing her back and leg pain, and Plaintiff was encouraged to use back exercises. Id. at 378-79. On October 10, 2012, Plaintiff complained of lower back and hip pain; the provider referred to it as "general [low back pain]" and noted that Plaintiff "can ambulate." Id. at 489-90. Finally, on May 7, 2013, Plaintiff complained of chronic

lower back pain, pain in both legs, and stated that she "can't walk." Id. at 475-76. The provider did

not note whether, on examination, Plaintiff could ambulate. Id. The Court concludes that because

the June 2013 x-ray revealed a diagnosis of degenerative disc disease, additional review by state

examiners is required.

Plaintiff second assignment of error is that the ALJ violated SSR 96-7p by failing to consider

Plaintiff's subjective complaints. Regarding credibility, the ALJ wrote:

> The evidence reflects inconsistencies between the claimant's allegations, testimony, and the record. The claimant alleges difficulty with concentration, but she displayed adequate attention and concentration throughout her hearing and application process. During the most recent hearing, the claimant testified that she was fired because she was unable to work without special accommodations. However, during her first hearing in 2012, she testified that she stopped working because her employer went out of business.
>
> The claimant also alleges that her impairments forced her to give up things she enjoys, such as working, socializing, and participating in activities as she did prior to the onset of her impairments. However, there is very little credible evidence in the record suggesting a medical reason for the claimant to cease those activities. In fact, physicians at Maury County Health Department advised the claimant to increase her exercise activity. The claimant also reported daily activities that fall within or exceed the restrictions set forth in the residual functional capacity. For instance, the claimant prepares meals, does laundry, washes dishes, shops for groceries, cares for her grandchild, and maintains the ability to drive.
>
> Due to the inconsistent statements and the factors found in SSR 96-7p, the claimant's allegations are not entirely credible and are severely undermined.

Id. at 24-25. Plaintiff contests both of these assertions, and contends that Plaintiff's statements

regarding her former employer are consistent, and that her activities of daily living do not rise to a

level that would suggest the absence of a disability.

At her first hearing on April 2, 2012, Plaintiff testified that she stopped working at the

daycare center because "the business closed." Id. at 56. At her second hearing on July 23, 2013,

Plaintiff testified that "I quit working because I was hurting so bad. And the school had changed hands to another lady. And just all the same people wasn't going to be there. The room that I worked in, I had a girl to help me. When it changed hands, I would be by myself. And I knew I couldn't do it. And she didn't make any other arrangements for me to have anybody work with me, so I had no other choice." Id. at 41. The ALJ asked, "[w]ell, my records indicate that you were laid off from that job," and Plaintiff answered, "[s]he did, she did lay me off." Id. at 42. On February 8, 2011, during N.J. Shuping's interview of Plaintiff, Plaintiff stated that she left because "the daycare where I worked allowed me to sit down when I needed to and allowed me not to lift or carry. I had to do no mopping or cleaning. This daycare closed and there is no other daycare that would allow me to work under these circumstances[.]" Id at 246. On February 28, 2011, Plaintiff completed a disability report and stated that she stopped working on December 30, 2010 because "the daycare closed." Id. at 261. During her psychological evaluation with Dr. Doineau on April 26, 2011, Plaintiff stated that "[i]n December 2000 that daycare facility went bankrupt and [Plaintiff] has been out of work since." Id. at 349. During her initial consultation at Centerstone on November 7, 2011, Plaintiff stated that she was "[l]aid off of work since Dec 2010. Was having physical health issues that limited her abilities at work and she was laid off." Id. at 456. At another Centerstone appointment on December 5, 2011, Plaintiff reported that she was "laid off from job at day care." Id. at 446. Although this issue is not directly related to Plaintiff's disability, a lack of credibility on one issue can call into question the Plaintiff's other testimony. Decheney v. Comm'r of Soc. Sec., 2015 WL 4526836 at *5 (W.D. Mich. July 27, 2015) (Declining to disturb the ALJ's credibility determination when "[t]he ALJ has found contradictions among the medical records, plaintiff's testimony, and other evidence[,]" including Plaintiff's history of alcohol abuse and activities of daily

living). Here, the Court concludes that the ALJ did not err in finding that Plaintiff's statements regarding her former job were inconsistent, or in concluding that this inconsistency led to a finding that Plaintiff was not credible.

Plaintiff also contends that the activities of daily living relied upon by the ALJ were not as intense as implied. Plaintiff asserts that although she prepares meals, she does so every other day and they are small; that although she does laundry, she does it only once a week for two hours; that although she washes dishes, she has to stop and rest if there are a lot of dishes; and that although her grandchild stays overnight on occasional weekends, she does not care for the child as he is six years old and cares for himself.

In a March 11, 2011, function report, Plaintiff wrote that she could do laundry for "2 hrs a week" and cleaning for "20 min once a week;" Plaintiff could also shop for "groceries or househol[d] products" "once a week" for "1 hr." Id. at 274-75. Plaintiff reported that she enjoyed "reading and watching TV" and that she had "dinner on Sundays ... with my children" and "talk[ed] on [the] phone every day ... to my mother and friends." Id. at 276. On April 12, 2011, Dr. Morton wrote that Plaintiff could "perform activities like shopping," "prepare a simple meal & feed himself/herself," and "care for personal hygiene." Id. at 336. On April 26, 2011, Dr. Doineau wrote that Plaintiff had no restrictions in understanding and carrying out instructions, making decisions, interacting with people, or responding to usual situations and changes. Id. at 354-55. Only Susan O'Malley, on March 14, 2012, wrote that Plaintiff would have a "poor" ability in every area, including an ability to perform activities of daily living. Id. at 423-24. Plaintiff's arguments that she could perform activities of daily living, but could not perform them to a certain standard, are not supported. The ALJ did not err in considering Plaintiff's activities of daily living.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' Rather, such determinations must find support in the record." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). Here, the ALJ did not sufficiently consider the June 2013 x-ray and Plaintiff's diagnosis of degenerative disc disease. This diagnosis supports Plaintiff's subjective complaints of pain and alleged activities of daily living. The Court concludes that because the ALJ did not consider properly the diagnosis of degenerative disc disease, his finding of Plaintiff's credibility is in error.

Accordingly, the Court concludes that the ALJ erred in his determinations and that the ALJ's decision was not supported by substantial evidence. As such, Plaintiff's motion for judgment on the record (Docket Entry No. 16) should be granted and this action should be remanded for further proceedings consistent with this opinion.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of April, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge